1
2
3
4
5
6

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

7  WAYNE A. JACKSON,                          Case No. 3:17-cv-00098-LRH-WGC

8                            Petitioner,                    ORDER

9        v.

10 HAROLD WICKHAM, et al.,

11                           Respondents.

12        Wayne A. Jackson's pro se 28 U.S.C. § 2254 petition for writ of habeas corpus is

13 before the court for final disposition on the merits (ECF No. 8).  As discussed below, the

14 petition is denied.

15    **I.    Procedural History and Background**

16        The charges in this case arose from an anonymous tip law enforcement received

17 that the two-year-old son of Jackson's housemate was sick and not being cared for and

18 that narcotic sales and manufacturing were occurring at the house (see exhibit 8).[1] He

19 was charged in Churchill County, Nevada, by way of information with trafficking in a

20 controlled substance – 28 grams or more; operating or maintaining place for unlawful

21 sale, gift or use of controlled substance; offer, attempt or commission of unauthorized

22 act relating to manufacture or compounding of certain controlled substances; abuse,

23 neglect or endangerment of a child; allowing child to be present during commission of

24 certain violations which involve controlled substances other than marijuana; and

25 possession of dangerous drug without prescription. Exh. 8. Jackson ultimately entered a

26 guilty plea to trafficking in a controlled substance – 28 grams or more. Exh. 19.

27

28 [1] Exhibits referenced in this order are exhibits to respondents' motion to dismiss, ECF No. 14, and are found at ECF Nos. 16-18.

1

The state district court sentenced Jackson to a term of 10 years to life. Exh. 24. Jackson did not file a direct appeal.  He filed a state postconviction petition. Exhs. 29, 48.  The state district court conducted an evidentiary hearing and thereafter dismissed the petition. Exhs. 52, 53. The Nevada Court of Appeals affirmed.  Exhs. 60.

Jackson's federal petition sets forth 3 grounds for relief based on ineffective assistance of counsel (ECF No. 8).  Respondents have answered the petition, and Jackson replied (ECF Nos. 28, 32).

## II.   Legal Standards

### a.  AEDPA Standard of Review

28 U.S.C. § 2254(d), a provision of the Antiterrorism and Effective Death Penalty Act (AEDPA), provides the legal standards for this court's consideration of the petition in this case:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693-694 (2002). This court's ability to grant a writ is limited to cases where "there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing

the AEDPA standard as "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (internal quotation marks and citations omitted).

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Lockyer*, 538 U.S. at 73 (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell*, 535 U.S. at 694.

A state court decision is an unreasonable application of clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d), "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer*, 538 U.S. at 74 (quoting *Williams*, 529 U.S. at 413). The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous; the state court's application of clearly established law must be objectively unreasonable. *Id*. (quoting *Williams*, 529 U.S. at 409).

To the extent that the state court's factual findings are challenged, the "unreasonable determination of fact" clause of § 2254(d)(2) controls on federal habeas review. *E.g., Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir.2004). This clause requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id*. The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous." 393 F.3d at 973. Rather, AEDPA requires substantially more deference:

> .... [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate

3

1   panel, applying the normal standards of appellate review, could not
    reasonably conclude that the finding is supported by the record.

2   *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir.2004); *see also Lambert*, 393

3   F.3d at 972.

4           Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be

5   correct unless rebutted by clear and convincing evidence. The petitioner bears the

6   burden of proving by a preponderance of the evidence that he is entitled to habeas

7   relief. *Cullen*, 563 U.S. at 181.

8                   **b.   Ineffective Assistance of Counsel**

9           Ineffective Assistance of Counsel (IAC) claims are governed by the two-part test

10  announced in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the

11  Supreme Court held that a petitioner claiming ineffective assistance of counsel has the

12  burden of demonstrating that (1) the attorney made errors so serious that he or she was

13  not functioning as the "counsel" guaranteed by the Sixth Amendment, and (2) that the

14  deficient performance prejudiced the defense. *Williams*, 529 U.S. at 390-91 (citing

15  *Strickland*, 466 U.S. at 687). To establish ineffectiveness, the defendant must show that

16  counsel's representation fell below an objective standard of reasonableness. *Id*. To

17  establish prejudice, the defendant must show that there is a reasonable probability that,

18  but for counsel's unprofessional errors, the result of the proceeding would have been

19  different. *Id*. A reasonable probability is "probability sufficient to undermine confidence in

20  the outcome." *Id*. Additionally, any review of the attorney's performance must be "highly

21  deferential" and must adopt counsel's perspective at the time of the challenged conduct,

22  in order to avoid the distorting effects of hindsight. *Strickland*, 466 U.S. at 689. It is the

23  petitioner's burden to overcome the presumption that counsel's actions might be

24  considered sound trial strategy. *Id*.

25      Ineffective assistance of counsel under *Strickland* requires a showing of deficient

26  performance of counsel resulting in prejudice, "with performance being measured

27  against an objective standard of reasonableness, . . . under prevailing professional

28

norms." *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (internal quotations and citations omitted). When the ineffective assistance of counsel claim is based on a challenge to a guilty plea, the *Strickland* prejudice prong requires a petitioner to demonstrate "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

If the state court has already rejected an ineffective assistance claim, a federal habeas court may only grant relief if that decision was contrary to, or an unreasonable application of, the *Strickland* standard. *See Yarborough v. Gentry*, 540 U.S. 1, 5 (2003). There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id*.

The United States Supreme Court has described federal review of a state supreme court's decision on a claim of ineffective assistance of counsel as "doubly deferential." *Cullen*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). The Supreme Court emphasized that: "We take a 'highly deferential' look at counsel's performance . . . through the 'deferential lens of § 2254(d).'" *Id*. at 1403 (internal citations omitted). Moreover, federal habeas review of an ineffective assistance of counsel claim is limited to the record before the state court that adjudicated the claim on the merits. *Cullen*, 563 U.S. at 181-84. The United States Supreme Court has specifically reaffirmed the extensive deference owed to a state court's decision regarding claims of ineffective assistance of counsel:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id*. at 689, 104 S.Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S. at 123. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S. at 124. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

1   *Harrington*, 562 U.S. at 105. "A court considering a claim of ineffective assistance of

2   counsel must apply a 'strong presumption' that counsel's representation was within the

3   'wide range' of reasonable professional assistance." *Id.* at 104 (quoting *Strickland*, 466

4   U.S. at 689). "The question is whether an attorney's representation amounted to

5   incompetence under prevailing professional norms, not whether it deviated from best

6   practices or most common custom." *Id.* (internal quotations and citations omitted).

7   Jackson pleaded guilty upon the advice of counsel, thus he "may only attack the

8   voluntary and intelligent character of the guilty plea by showing that the advice he

9   received from counsel was [ineffective] . . . .  and that there is a reasonable probability

10  that, but for counsel's errors, he would not have pleaded guilty and would have insisted

11  on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 56-57, 59 (1985); *Lambert v. Blodgett*,

12  393 F.3d 943, 980-981 (9th Cir. 2004).

13  **III.   Instant Petition**

14  **Ground 1**

15  Jackson contends that his plea counsel was ineffective for failing: to discuss the law

16  in conjunction with the facts of his case to determine whether to file a motion to

17  suppress; to assist him in making an informed decision as to the strengths and

18  weaknesses of the case; and to file a meritorious motion to suppress. He also argues

19  that counsel failed to review the preliminary hearing transcript or a copy of the search

20  warrant affidavit with him (ECF No. 8, pp. 3-6).

21  At Jackson's evidentiary hearing on his state postconviction petition, his plea

22  counsel, Justin Clouser, testified that he had been retained to try to get the case

23  negotiated and resolved as quickly as possible. Exh. 52, pp. 6-48. Clouser also

24  explained:

25       A: Well, at the point that I was retained this case was already six
     months old, so there was – there was preliminary work that had already
26       been done, and at the point where I was retained it was a matter of trying
     to get this done as quickly as possible, get this case over with.
27

28

I believe Mr. Jackson was under daily drug tests and he just wanted this done, and so my – my scope of representation was not as thorough or as extensive as it might have been if I'd been retained to take this case to trial. . . . .

Q: Did you ever talk to Mr. Jackson about the potential of suppressing the evidence in any way?

A: We talked about the evidence in great detail a number of times.

Q: Okay, Well, the evidence was available to present at trial –

A: Right.

Q: --correct? Did you talk about –talk about the aspect, legal concept, that any of the evidence could have been suppressed?

A: We talked about the validity of the evidence, the entire process of how the search took place. We had those discussions, yes.. . .

*Id.* at 20-23.

Counsel further testified that he and Jackson discussed the search warrant and the search itself and that Jackson went into great detail about how that day had unfolded. Counsel discussed with Jackson the discrepancies between what Jackson was telling him and the police report.  They also discussed what his housemate, Wendy Lattin (the mother of the child in question), would likely say. Counsel testified that he and Jackson discussed possible challenges to the search warrant, which he described as:

A: Well, the fact that if they were doing something, I believe that it was his belief that he just gave them permission to do a visual search and that the pipe, I think, had been found in a drawer that was easily accessible to the child, from my understanding, and we talked about the potential for trying to fight that and where that would go, and the reality was that based upon the consent that was given where the child had access to the house that yes, we could spend the time, but the chances of success based upon [the housemate's] own testimony, the chances of success for suppressing the evidence was virtually zero.

*Id.* at 28-29.

Clouser testified that he talked with his client about the weaknesses of their case, including the amount of methamphetamine found (after police later returned with a

search warrant) and the fact that Lattin would likely testify to anything that would possibly get her a reduction in charges, which likely meant she would try to lay all blame on Jackson. Counsel said he and Jackson discussed options for fighting the charges, but that Jackson was not interested in a protracted fight at that time, and Jackson told his counsel that he did not want to go to trial. Clouser insisted that he communicated frequently with Jackson, that it was a tough case given Lattin's testimony, and that he followed and carried out Jackson's instructions.

Jackson also testified. Exh. 52, pp. 48-112.  He stated that when officers arrived and told him that they were there for a welfare check of the two-year-old, Jackson told the officers they were permitted to inspect the areas of the house to which the boy had access.  Jackson said he specified the areas as the living room and master bedroom. Looking at photographs, Jackson said that another bedroom was not the boy's room at that time, but that it was in the process of being renovated and that it was supposed to be a place for the child to sleep in the future.  He said that the bedroom contained no bedding or clothes. He testified that, though he had given limited consent, the police "came in and kind of fanned out into everywhere." *Id.* at 68. He said he followed an officer into the sewing room, told him that was not one of the rooms he had agreed to let them search, and the officer said they were going to search everywhere.  Jackson told the officer that was not what he agreed to and asked them to leave.  The officer walked back to the living room and announced that Jackson had rescinded his consent to search.  After that other officers emerged from the uninhabited room that was under renovation and said that they had found a pipe. At that point, an officer left to obtain a search warrant, while Jackson waited with the other police.

He testified that when Clouser represented him he never received a copy of the search warrant.  Jackson stated that Clouser never informed him of ways to challenge the admissibility of the evidence and only told him that the case against him was strong.

He testified that even though he wanted to negotiate the case, he expected his counsel to explain what legal challenges could be raised.

On cross-examination Jackson acknowledged that there were probably some toys as well as clothing belonging to Lattin in the bedroom in question.  Jackson told officers that he was getting the room ready for the child.  Jackson said as he recalled he told police that they could search the rooms that the boy had access to, an officer responded by saying "the rooms that he slept in," and Jackson said yes.  He also agreed that he had read and understood the guilty plea.  On redirect, Jackson clarified that any items in the bedroom in question were not usable but were more akin to junk or trash that had been discarded by Lattin.

Sergeant Lee Orozco testified. Exh. 52, pt. 2, pp. 114-130. He stated that they were invited into the residence, and that they told Jackson they were there on a child welfare check and to investigate reports of drug activity.  He said he told Jackson "after we take care of the child part" that they would like to be able to search the house to make sure there was no drug activity. *Id.* at 118. Orozco testified that Jackson said, "go ahead, you can search wherever." *Id.* He said that he was talking with Jackson as he searched the utility room and that after about three or four minutes, Jackson revoked consent. Orozco then returned to the living room.

On cross-examination, Orozco clarified that Jackson had limited the search to the child's room or where the child slept and the sewing/utility room.

Officer Tony Vierra testified that Jackson gave the officers permission to search only the rooms to which the child had access.  Exh. 52, pp. 131-155.  He said he and another officer searched the bedroom that Jackson said they were renovating; Vierra said that it was the child's room and had diapers and other child items in it. The other officer opened the dresser drawer and a methamphetamine pipe rolled from the back of the drawer to the front. He stated that they found the pipe almost immediately after

1    entering the room and that shortly after they found it Orozco announced that Jackson

2    had withdrawn consent.

3        The Nevada Court of Appeals affirmed the denial of this claim in Jackson's state

4    postconviction petition:

5            First, Jackson argues that his counsel was ineffective for failing to
             reasonably investigate the circumstances and the law regarding the
6            search of Jackson's residence. Jackson asserts counsel should have
             discussed this matter with him in detail and reviewed documentation
7            related to the search, as counsel would have then decided to file a motion
             to suppress the evidence obtained during the search. Jackson failed to
8            demonstrate his counsel's performance was deficient or resulting in
             prejudice.
9
             At the evidentiary hearing, Jackson's counsel testified that he
10           discussed the evidence and the entire process of the search with Jackson,
             including Jackson's consent to search and the search warrant. Counsel
11           stated he and Jackson discussed possible challenges to the search, but
             that counsel concluded there was little chance of success had they sought
12           to suppress the evidence. Counsel further testified that Jackson had
             retained him with the specific purpose of negotiating a plea agreement
13           and the majority of counsel's efforts went towards securing a favorable
             agreement. Based upon that testimony, the district court concluded
14           counsel acted in an objectively reasonable manner and substantial
             evidence supports that conclusion. Jackson failed to demonstrate a
15           reasonable probability of a different outcome had counsel had further
             discussions with Jackson or reviewed the search documentation in further
16           detail. Therefore, we conclude the district court did not err in denying this
             claim.
17

18   Exh. 60, p. 2.

19       Jackson faced six serious criminal counts, and counsel's plea negotiations resulted

20   in an agreement to plead guilty to a single, albeit serious, count.  Officers testified on

21   postconviction review that they found the methamphetamine pipe almost immediately

22   upon entering a room that they understood to be the child's room or to which the child

23   had access and that they ceased the search when Jackson revoked consent.

24   Jackson's testimony did not even directly contradict the officers. Clouser testified that

25   although he was retained to focus on plea negotiations, he discussed the search and

26   the other aspects of the case with Jackson in detail. Jackson has not shown a

27   reasonable probability of a different outcome had his counsel discussed the search

28

further with him.  Jackson has failed to demonstrate that the Nevada Court of Appeals'

decision was contrary to or involved an unreasonable application of *Strickland*.  28

U.S.C. § 2254(d).  Federal habeas relief is denied as to ground 1.

**Ground 2**

Jackson argues that his counsel was ineffective for failing to file a motion to

suppress the evidence seized during the search of his residence because Jackson

limited the scope of his consent to the specific rooms to which the child had access

(ECF No. 8, pp. 7-9).

Officer Vierra further testified at the evidentiary hearing:

> Q: So while you were in this uninhabited room, the room that has the
> dresser, did Mr. Jackson say wait, wait a minute, that's the wrong room?
>
> A: No.
>
> Q: Did he say anything like that?
>
> A: No.
>
> Q: Did he indicate that that wasn't the room he meant?
>
> A: No.

Exh. 52, pt. 2, pp. 136-137.

The Nevada Court of Appeals held that Jackson failed to show that his counsel's

performance was deficient or that he suffered any prejudice:

> During the evidentiary hearing, testimony revealed that officers initially
> entered Jackson's residence and advised Jackson they had received
> information that a young child was possibly neglected and exposed to
> drug activity. Jackson initially consented to a search of areas of the home
> to which the child had access.  Officers testified that they searched a room
> they understood to be the young child's bedroom and discovered the pipe
> in a dresser drawer.  Following the discovery of the pipe, Jackson
> withdrew his consent to search. The district court noted that the testimony
> provided at the hearing included information that the child's diaper was in
> the room, there appeared to be nothing to prevent the child from
> accessing the room, and Jackson did not object when the officers entered
> the room to search it. Based upon this testimony, the district court
> concluded Jackson had consented to the search of this room and
> substantial evidence supports that conclusion. *See Canada v. State*, 756
> P.2d 552, 553 (Nev. 1988) ("Whether consent has been exceeded is a

factual question to be determined by examining the totality of the circumstances.").

Given the record demonstrating that Jackson consented to the search of the child's room, he failed to demonstrate a reasonable probability of a different outcome had counsel filed a motion to suppress the evidence obtained during the search pursuant to his consent. Therefore, the district court did not err in denying this claim.

Exh. 60, pp. 3-4.

The testimony recounted in this order again supports the Nevada Court of Appeals' decision as to this claim.  Jackson has not shown that the Nevada Court of Appeals' decision was contrary to or involved an unreasonable application of *Strickland.*  28 U.S.C. § 2254(d).  Ground 2 is, therefore, denied.

**Ground 3**

Jackson claims that his counsel was ineffective because counsel was unable to discuss the law regarding the inclusion of false information or omission of information in an affidavit, and therefore failed to file a motion to suppress based on the theory that the affidavit contained false statements and omitted material facts (ECF No. 8, pp. 10-13). In particular, Jackson argues that his limitation of the search was omitted.

Officer Viera also testified at the evidentiary hearing as follows:

Q: Did you at any time tell [Jackson] you would be applying for a search warrant?

A: Yeah.  Once I talked to him about the meth pipe and asked who it belonged to, they both denied that it was theirs. I believe they said it possibly belonged to an old renter they had.

I advised them at that point I was going to contact the D.A.'s office and try to obtain a search warrant for the rest of the house for any more paraphernalia or other narcotics.

Q: Did you apply for the search warrant?

A: I did.

Q: Did you sign the affidavit in support of the search warrant?

A: I did.

Q: Was there anything in that document that wasn't truthful?

A: No.

Q: Anything that you falsified?

A: No.

Exh. 52, pt. 2, pp. 137-138.

Further, Jackson's counsel testified:

Q: But you did discuss the search warrant with Mr. Jackson?

A: Oh, yes, how the events of that whole day unfolded.

Q: Based on what he told you, did any issues cause you concern?

A: No.

Q: So Mr. Jackson, he told you he didn't want to go to trial?

A: Yes.

Q: Why?

A: Because of the potential for what all the charges were were significant, and if he could avoid that, he wanted to avoid that. It was like six charges.

Q: So he wanted to avoid a possible lengthy sentence?

A: Yes.

Exh. 52, p. 1, pp. 37-38.


Rejecting this claim, the Nevada Court of Appeals reasoned:

[Jackson's] counsel testified he reviewed the circumstances related to the search and concluded a motion to suppress was unlikely to be successful. Counsel testified he was retained to negotiate a plea agreement and focused his efforts on that endeavor. Under these circumstances, Jackson failed to demonstrate it was objectively unreasonable to decline to file a motion to suppress evidence.

In addition, the officer who applied for the search warrant testified at the evidentiary hearing that he did not include anything untrue or omit material facts when he sought the warrant. The record demonstrates that the officers approached the residence due to a call regarding the child's welfare, discovered a methamphetamine pipe when searching pursuant to Jackson's consent, and, following Jackson's withdrawal of consent, the child's mother advised the officers that Jackson had a substantial amount of drugs in a lockbox in a bedroom. The search warrant and accompanying affidavit contained this information. Under these circumstances, Jackson failed to demonstrate a reasonable probability of

1
2 a different outcome had counsel sought to suppress evidence obtained
pursuant to the search warrant.

3 Exh. 60, p. 4.

4     The fact that Jackson limited the search in some form is not in dispute, thus that is

5 not a material fact that was omitted. This claim is belied by the record. Jackson has not

6 demonstrated that the Nevada Court of Appeal's decision was contrary to or involved an

7 unreasonable application of *Strickland*. 28 U.S.C. § 2254(d).  Federal habeas relief is

8 denied as to ground 3.

9     Accordingly, the petition is denied in its entirety.

10 **IV.**    **Certificate of Appealability**

11     This is a final order adverse to the petitioner.  As such, Rule 11 of the Rules

12 Governing Section 2254 Cases requires this court to issue or deny a certificate of

13 appealability (COA).  Accordingly, the court has *sua sponte* evaluated the claims within

14 the petition for suitability for the issuance of a COA.  *See* 28 U.S.C. § 2253(c); *Turner v.*

15 *Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

16     Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has

17 made a substantial showing of the denial of a constitutional right."  With respect to

18 claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists

19 would find the district court's assessment of the constitutional claims debatable or

20 wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463

21 U.S. 880, 893 & n.4 (1983)).  For procedural rulings, a COA will issue only if reasonable

22 jurists could debate (1) whether the petition states a valid claim of the denial of a

23 constitutional right and (2) whether the court's procedural ruling was correct.  *Id.*

24     Having reviewed its determinations and rulings in adjudicating Jackson's petition, the

25 court finds that none of those rulings meets the *Slack* standard.  The court therefore

26 declines to issue a certificate of appealability for its resolution of Jackson's petition.

27 ///

28

V.    **Conclusion**

**IT IS THEREFORE ORDERED** that the petition (ECF No. 8) is **DENIED**.

**IT IS FURTHER ORDERED** that a certificate of appealability is **DENIED**.

**IT IS FURTHER ORDERED** that petitioner's motion for status check (ECF No. 34) and motion for judicial action (ECF No. 35) are both **DENIED** as moot.

**IT IS FURTHER ORDERED** that the Clerk enter judgment and close this case.


DATED this 5th day of August, 2020.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE